IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CALEB MORRIS, | § | |
| | § | No. 535, 2014 |
| Respondent Below- | § | |
| Appellant, | § | Court Below: Family Court |
| | § | of the State of Delaware in and |
| v. | § | for New Castle County |
| | § | |
| DIVISION OF FAMILY SERVICES, | § | File Nos. CN08-3070, 13-12-06TN |
| | § | Petition Nos. 12-19664, 13-38119 |
| Petitioner Below- | § | |
| Appellee. | § | |

Submitted: May 13, 2015
Decided: June 15, 2015

Before **HOLLAND**, **VALIHURA**, and **VAUGHN**, Justices.

### ORDER

On this 15th day of June 2015, it appears to the Court that:

(1) Respondent-Below/Appellant Caleb Morris ("Father") appeals from a Family Court order terminating his parental rights with regard to his biological daughter, T.M.[1] Father raises two claims on appeal. First, Father argues that the trial court erred in finding that he failed to plan adequately for his child's needs because he did not have housing or employment at the time of the termination of parental rights ("TPR") hearing. Second, Father contends that the trial court erred by finding that terminating his parental rights was in the best interest of the child. We find no

---

[1] The Court assigned pseudonyms on appeal pursuant to Del. Supr. Ct. R. 7(d).

1

merit to Father's appeal and affirm.

(2) Caleb Morris is the biological father of T.M. T.M. has an older half-sister, O.B.[2] T.M. and O.B. (collectively the "children" or the "girls") share the same biological mother, A.M. ("Mother").[3] Father does not have any parental rights as to his non-biological daughter, O.B. The Family Court did, however, consider Father's relationship with O.B. in its decision to terminate his parental rights because all parties agreed that the girls should not be separated. The girls were taken into custody by the Department of Services for Children, Youth, and their Families ("DSCYF") on June 13, 2012 by *ex parte* order of the Family Court.

(3) At both a June 20, 2012, preliminary protective hearing and a July 18, 2012, adjudicatory hearing, Father stipulated to findings of dependency because he was serving a three year sentence at Howard R. Young Correctional Institute ("HRYCI") for possession with intent to deliver a controlled substance. T.M.'s mother also stipulated to dependency due to lack of housing and employment. As a result, the girls were placed in a foster home.

(4) Father and Mother accepted and signed DSCYF case plans. The goal of Father's case plan was reunification with T.M. and required him to: (1) find

---

[2] Because this appeal pertains only to the termination of Father's parental rights as to T.M., it is unnecessary to discuss in full his relationship with O.B.

[3] Mother's parental rights as to both T.M. and O.B. were also terminated.

employment, (2) find suitable housing, (3) work on his parenting skills, (4) address any substance abuse issues, (5) take a life skills class, (6) comply with probation/parole conditions after incarceration, and (7) have visitation with T.M. following his release from incarceration. At the time of the dispositional hearing, Father reported that he had completed a parenting class and a life skills class, and was participating in substance abuse programs.

(5) The Family Court held review hearings on December 4, 2012; February 28, 2013; and May 20, 2013. Father remained incarcerated throughout these hearings. At the first review hearing, Father reported that he had completed Alcoholics Anonymous and a budgeting class in addition to the previously completed classes. At the second review hearing, Father remained in compliance with the terms of his case plan and indicated that he would be entering a halfway house in May 2013. At the third review hearing, Father indicated that he would not be released from incarceration until September 2014.

(6) On July 17, 2013, the Family Court held a permanency hearing, at which both Father and Mother appeared. Father remained incarcerated but believed he would be eligible for work release in January 2014. Father declined physical visitation with T.M., but did request telephone contact with her.

(7) On November 21, 2013, a post-permanency hearing was held. There, the

court learned that Father was still incarcerated and would not obtain work release earlier than February 1, 2014.

(8) On February 24, 2014, the Family Court held a second post-permanency hearing. Mother failed to appear. Father remained incarcerated, but reported that he would be moved to a halfway house and work release program later that week. Father arrived at the Plummer Center on February 26, 2014, at which time he became eligible for home confinement and a work release program.

(9) Leading up to a TPR hearing held on July 14, 2014, DSCYF permanency worker, Sarah Riffe, met with Father to discuss plans for adequate housing. At their first meeting in March 2014, Father indicated that he would reside with his mother and that she would help him take care of T.M. and O.B. During the dependency case, however, Father's mother consistently refused to take in T.M. and O.B. due to concerns of the financial burden it would place on her. When Riffe met with Father a second time in June 2014, Father admitted that he was no longer sure that his mother would assist him with the girls. Riffe testified that Father seemed very unsure of where he would be living upon his release.

(10) At the time of the July 14, 2014, TPR hearing, Father was still residing at the Plummer Center. Father testified that he had a new housing plan that involved his paternal aunt, D.M. Father conceded, however, that he had not personally spoken

4

with D.M. about his plan and was unsure whether she was aware of the girls' existence and Father's desire to live with the two girls at her home. Father also admitted that he had not seen D.M. since before his incarceration.

(11) Father was unsuccessful in finding employment while residing at the Plummer Center. Therefore, he conceded that he would not be able to immediately contribute to the financial needs of the girls upon his release from prison and asked the court for an additional ninety days from the time of his release to obtain a job and housing.

(12) On April 12, 2013, the girls were moved from their original foster home to a new foster home. As of the date of the TPR hearing, both children were reportedly doing well in the new foster home. The girls have been put on the DelAdoptList, which is circulated through local adoption agencies, and DSCYF is seeking families that are interested in adopting them together.

(13) On August 21, 2014, the Family Court issued an order terminating Father's parental rights based upon his failure to meet his case plan requirements.[4] The Family Court also found that termination was in the best interest of the girls. The order legally freed both T.M. and O.B. for adoption. This appeal followed.

(14) "When reviewing the Family Court's termination of parental rights, our

---

[4] *See* 13 *Del. C.* § 1103(a)(5).

5

standard and scope of review involves a review of the facts and law, as well as the inferences and deductions made by the trial court."[5] To the extent that the issues on appeal implicate rulings of law, we conduct a *de novo* review."[6] "To the extent that the issues on appeal implicate rulings of fact, we conduct a limited review of the factual findings of the trial court to assure that they are sufficiently supported by the record and are not clearly wrong."[7] "This Court will not disturb inferences and deductions that are supported by the record and are the product of an orderly and logical deductive process."[8]

(15) In Delaware, the statutory standard for terminating parental rights requires a two-step analysis.[9] First, there must be clear and convincing evidence of at least one of the grounds for termination enumerated in 13 *Del. C.* § 1103(a).[10] Second, the trial judge must make a determination that severing the parental rights is in the best interest of the child.[11] The basis for termination of parental rights in this case is failure to plan under section 1103(a)(5). "Under section 1103(a)(5), when the child is in the care of DFS, the Family Court must determine that (1) the parent is unable or has failed to plan adequately for the child's needs, health and development and (2)

---

[5] *Powell v. Dep't of Servs. for Children, Youth, & Their Families*, 963 A.2d 724, 730 (Del. 2008).
[6] *Id.* at 730-31 (citations omitted).
[7] *Id.* at 731 (citations omitted).
[8] *Id.* (citations omitted).
[9] *Shepherd v. Clemens*, 752 A.2d 533, 536-37 (Del. 2000) (citations omitted).
[10] *Id.* at 537; 13 *Del. C.* § 1103(a)(1)-(8).
[11] *Powell*, 963 A.2d at 731.

one or more of five conditions exist."[12]   "Also, when the statutory basis for termination is failure to plan there must be . . . proof that DFS made *bona fide* reasonable efforts to preserve the family unit."[13]

(16) Father argues that the Family Court erred by concluding that he failed to plan for T.M.'s needs because his incarceration prevented him from securing housing and employment. He also argues that the court erred by finding that termination of his parental rights was in the child's best interest.

(17) After thoroughly reviewing the parties' briefs and the record below, we find that there is clear and convincing evidence supporting termination of Father's parental rights. Although Father contends that incarceration alone is not enough to terminate an individual's parental rights, he provides no Delaware authority that supports his position. Instead, he relies on two out-of-state cases for the proposition that a trial court cannot terminate parental rights based solely on the parent's incarceration.[14] We find these non-binding cases unpersuasive. This Court has found that when a parent's incarceration prevents him or her from completing the major

---

[12] *Id.* (citations omitted).

[13] *Upton v. Div. of Family Servs.*, 2014 WL 7010967, at *4 (Del. Dec. 11, 2014) (citations omitted).

[14] *N.J. Div. of Youth & Family Servs. v. R.G.*, 90 A.3d 1258, 1277-78 (N.J. 2014) (concluding that father's incarceration was not sufficient grounds to terminate his parental rights, in part, because of evidence that he maintained a bond with the child through letters and phone calls); *Ariz. Dep't of Econ. Sec. v. Rocky J.*, 323 P.3d 720, 721 (Ariz. Ct. App. 2014) (affirming the trial court's decision not to terminate father's rights, in part, because of his repeated efforts to communicate with the child during his incarceration).

7

aspects of his or her case plan, the parent has failed to plan adequately under 13 *Del.*
*C.* § 1103(a)(5).[15]

(18) Here, DSCYF developed a sufficient case plan for Father, which included several requirements Father had to satisfy in order for him to be reunified with his daughter. Father failed to satisfy a number of those requirements, including those most necessary to provide adequate care for T.M., *i.e.*, housing and income. The record also shows that each of the five enumerated conditions listed in 13 *Del. C.* § 1103(a)(5) have been met.[16]

(19) After concluding that the statutory grounds for termination of parental rights exist, the court must determine that termination is in the child's best interest.[17] While the court is required to consider all relevant factors when conducting a best interest analysis, it is specifically required to consider the eight factors enumerated in 13 *Del. C.* § 722(a).[18] When making a best interest determination, the court may

---

[15] *See Upton*, 2014 WL 7010967, at *3-4 (upholding termination of father's rights on the trial court's reasoning that father would not be able to complete the terms of his case plan while incarcerated); *Boyer-Coulson v. Div. of Family Servs.*, 2012 WL 1944868, at *2 (Del. May 30, 2012) (holding that father's incarceration rendered him incapable of discharging his parental responsibilities and prevented him from completing the elements of his case plan).

[16] The existence of just one condition is sufficient. 13 *Del. C.* § 1103(a)(5).

[17] *Shepherd*, 752 A.2d at 536-37.

[18] 13 *Del. C.* § 722 provides:
> (a) The Court shall determine the legal custody and residential arrangements for a child in accordance with the best interests of the child. In determining the best interests of the child, the Court shall consider all relevant factors including:
>> (1) The wishes of the child's parent or parents as to his or her custody and residential arrangements;

give different weights to different factors.[19] Thus, the court may decide that one or a few of the factors outweigh all of the remaining factors.[20]

(20) The trial court's conclusion that it was in T.M.'s best interest for Father's rights to be terminated is supported by the record. The trial court made factual findings as to each of the "best interest" factors, considered the totality of these findings, and rendered an informed decision according to the law. We find no error in the trial court's analysis or conclusion.

NOW, THEREFORE, IT IS ORDERED that the judgment of the Family Court is **AFFIRMED**.

BY THE COURT:

_____
Justice

---

(2) The wishes of the child as to his or her custodian or custodians and residential arrangements;

(3) The interaction and interrelationship of the child with his or her parents, grandparents, siblings, persons cohabiting in the relationship of husband and wife with a parent of the child, any other residents of the household or persons who may significantly affect the child's best interests;

(4) The child's adjustment to his or her home, school and community;

(5) The mental and physical health of all individuals involved;

(6) Past and present compliance by both parents with their rights and responsibilities to their child under § 701 of this title;

(7) Evidence of domestic violence as provided for in Chapter 7A of this title; and

(8) The criminal history of any party or any other resident of the household including whether the criminal history contains please of guilty or no contest or a conviction of a criminal offense.

[19] *Powell*, 963 A.2d at 735 (citations omitted).

[20] *Id.* (citations omitted).

9